594 So.2d 12 (1992)
Darrell McDavid
v.
STATE of Mississippi.
No. 90-KA-0616.
Supreme Court of Mississippi.
January 15, 1992.
*13 George T. Holmes, Jackson, for appellant.
Mike C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and SULLIVAN and BANKS, JJ.
HAWKINS, Presiding Justice, for the Court:
Darrell McDavid appeals his conviction of the sale of cocaine for which he was sentenced as a habitual offender under Miss. Code Ann. § 99-19-81 (Supp. 1990) to thirty years in prison without possibility of probation or parole. For the reasons set out below, we reverse and remand for a new trial.

FACTS
On February 8, 1989, Officer Beverly Harris of the Jackson Police Department was working undercover along with Detectives Preston Carter, Earl Clowers, and other officers. At approximately 7:30 that night, Harris and a confidential informant, whose name at trial was revealed as J.C. Jones, pulled into a gravel area near the corner of Sears and Mayes streets. They were in Jones's car. Cars were parked in the area and several people were milling around the cars.
Harris testified that she saw McDavid walking from car to car talking briefly with the occupants of each car. Harris had never seen McDavid before. The night was cold, and he had on a parka covering his head and ears with a tie-on beneath his chin, leaving only his face exposed. McDavid approached the informant's car and asked: "Man, what can I get you? What you need?" Jones, the informant, replied that he needed "twenty-five cents' worth", which in street language means twenty-five dollars of cocaine. McDavid answered: "Man, it'll be thirty to forty minutes because I don't want people gathering up because of the police."
As she and the confidential informant were driving off, McDavid returned and told them, "Wait, wait, hold it, hold on, I got what you need right here, man. Hold on, hold on."
She then told the confidential informant, "Let's get out," and the two of them got out of the car.
Harris continued:
A. What happened, I peeled off a twenty dollar bill and I gave it to him, and then he said, "Twenty-five." I said, "Well, I don't have anything but twenties. Do you have change?" He said, "no." And then one thing, we fussed about the twenty and I said, "That's all I have." Just like that. And by the fact that he was rushing us, he went ahead and he grabbed my twenty dollars.
Harris then heard someone yell, "Police!" and someone else holler "Gladney! Gladney!" The crowd started scattering. At this moment, Detective William Gladney, who was on routine patrol in the area, drove by the graveled area and saw McDavid throw something on the ground. Gladney got out of his car, placed McDavid against the car and frisked him. Detectives Carter and Clowers then approached and watched McDavid while Gladney retrieved the item that McDavid threw to the ground. The item was a balled up twenty dollar bill.
Detectives Carter and Clowers were not close enough to see the transaction, but did listen by short wave radio transmission. Harris was wearing a body transmitter. Carter testified:
A. Basically we could hear most of the conversation, especially her conversation. If the person she was confronting or talking to or surrounding was a distance away from her or a few feet away from her, we couldn't  we could barely pick up what they were saying. But we could hear her transmission pretty clearly.
Carter was asked over defense objection if he heard McDavid and Harris have a conversation, to which he replied, "To my belief, yes." He was then asked over objection, *14 "And did you hear them discussing money?" and he replied, "Yes."
He was then asked what they were talking about, and he answered:
A. Discussing the price of the alleged cocaine that was sold, which was  he was asking twenty-five dollars for it and at the point she said she only had twenty dollars and he would have to take it.
He then heard someone yell, "Police, Gladney!"
Clowers testified that he heard Harris's and the confidential informant's voices over the transmitter, and also a third voice.
He testified over objection that the third voice was "similar" to the actual voice of McDavid who he later talked to.
This was McDavid's second trial, the first having ended in a hung jury. McDavid testified that he was present when the sale took place, but did not participate in any drug transaction. His version was markedly different from the State's.
McDavid testified that, although he did not know Harris and would not recognize her in court, the incident precipitating his arrest began with the confidential informant, J.C. Jones, nicknamed "Honeyman," driving up, accompanied by this unidentified woman. "Honeyman" had a brother married to McDavid's sister. "Honeyman" started talking to McDavid and, after chatting about McDavid's sister's children, asked him if he knew where "any dope was or did I know `Kitty Cat'."
McDavid replied, "I don't know where there's no dope, but I know Kitty Cat." He pointed out "Kitty Cat's" house across the street. At that moment "Kitty Cat" drove up across the street and parked.
"Honeyman" and the woman then got out of their car. "Honeyman" asked "Kitty Cat" for a quarter of rock.
McDavid was just about to give "Kitty Cat's" response when the State objected to it as being hearsay. The court sustained the objection.
The court did permit McDavid to state that they had an argument over money. Somebody yelled, "Police!" The police arrived, and McDavid was frisked. Gladney, according to McDavid, retrieved two ten dollar bills off the ground, and asked him if this was his money. He replied, "No, sir, I didn't have no money. But if you want me to have it, I'll take it." Gladney put the money into his pocket and told him he could go.
Following trial McDavid was found guilty and sentenced to thirty years imprisonment, and as an habitual offender under Miss. Code Ann. § 99-19-81 (Supp. 1989) without possibility of parole.

LAW
We address three of McDavid's assignments. As to the hearsay, he first complains that incompetent hearsay testimony was admitted by permitting Harris to give the conversation between Jones, the confidential informant, and McDavid. He then complains that the court unfairly applied its ruling by refusing to permit him to testify as to the conversation he heard between Jones and "Kitty Cat."
His second assignment complains that the circuit judge should have excluded the testimony of Carter and Clowers as to what they heard over the radio transmitter, and also giving an opinion it was his voice they heard.
His third assignment complains that the trial court erred in allowing repeated leading questions by the State during its direct examination of the various witnesses.

I. HEARSAY AND OPINION BOLSTERING
Harris's testimony of the conversation between McDavid and the confidential informant, and between McDavid and herself in transacting the sale of cocaine was not hearsay. Her testimony of this discussion was relating, first-hand, relevant acts in the criminal offense. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); United States v. Cintolo, 818 F.2d 980 (1st Cir.1987); United States v. Payden, 622 F. Supp. 915 (D.C.N.Y. 1985); Graves v. State, 492 So.2d 562 (Miss. 1986); West v. State, 485 So.2d 681 (Miss. 1985).
*15 For the same reason, Carter's and Clowers's testimony of what they heard over the short wave radio was not hearsay. They, too, were giving a first-hand account of what was said by the parties involved in the sale of the cocaine. This conversation was an ingredient of the crime.
The circuit judge should be cautious and wary before admitting testimony such as Carter's and Clowers's, however, and only after laying the proper predicate. It is not competent testimony until the officer who saw and heard the defendant talking (in this case Harris) first testifies what was said. Then, the officers away from the scene may be permitted to relate the conversation they heard via radio between the seller and the law enforcement purchaser on the scene as corroboration of the purchaser's testimony of what was said. And, such testimony should be restricted to what words they heard, not a characterization of what the conversation was about.
Before such officers should be permitted to express an opinion that the seller's voice was that of the defendant, an even more stringent predicate must be laid, especially when, as here, no tape recording was made of the sale transaction. All the officers heard was a short wave radio transmission of the transaction. The jury was not afforded an opportunity to hear the transmission, and short wave radio transmissions normally leave much to be desired. Also, there is too much temptation on the part of the law enforcement officer to give the State and not the defendant the benefit of the doubt. And such an opinion, even when permitted, is at best tenuous.
Carter and Clowers testified they had heard the voices of Harris and the confidential informant frequently, and no doubt had heard it in person as well as over the radio receiver. No particular problem is encountered in their identification of these two voices over the radio as those of Harris and the informant. They had never heard or met McDavid prior to that night's sale, however.
Before admitting such opinion testimony, the State should first have been required to offer testimony by these officers as to when, where, and under what circumstances they later heard the voice of McDavid. If such subsequent conversation was of such nature as to form a basis for the opinion, it is permissible to permit it. Sparks v. State, 412 So.2d 754, 757 (Miss. 1982). In this case no such predicate was laid. Both officers saw and heard McDavid when Gladney briefly questioned him at the scene, but neither Carter nor Clowers offered the time, place or circumstances under which they heard McDavid's voice subsequent to the transaction, and upon which to base a valid opinion that the voice on the radio was his.
It was error to permit Carter to characterize what the conversation between Harris and the seller was about; instead it should have been restricted to what was said, to the best of his recollection.
It was error for the court first to permit Carter to testify he had heard McDavid and Harris have a conversation when no adequate predicate had been laid. The prosecutor's question "And did you hear them discussing money?" was objectionable for two reasons: It was blatantly leading and also it characterized what was said instead of simply relating what was said.
The circuit judge should have required sufficient testimony from Carter and Clowers to determine they had a basis for expressing the opinion that the seller's voice was that of McDavid before permitting them to give such opinion. In this case, neither Carter nor Clowers had met McDavid before that night. It was error under the facts of this case for the court to admit any opinion testimony as to the stranger's voice on the radio being that of McDavid. The opinion was specially damaging because the only other identification of McDavid as the seller of the cocaine was Harris, who had not viewed him under the best of conditions, herself.
There is no merit to McDavid's contention that permitting Carter's and Clowers's testimony about what they heard on *16 the radio was erroneous "bolstering" of the testimony of Harris. Such evidence, if otherwise admissible, would not be inadmissible simply because it corroborated her testimony. Henry v. State, 209 So.2d 614, 617 (Miss. 1968).

II. EXCLUSION OF McDAVID'S VERSION OF CONVERSATION
As noted, McDavid did not deny a sale of rock cocaine took place. He acknowledged that he was right there on the scene, as an innocent spectator, however. Had McDavid attempted to describe another sale, at another time or place, such evidence would have been irrelevant. According to his testimony, however, his was the identical transaction about which Harris testified, but the seller was not him. It was "Kitty Cat."
Therefore, anything he testified he saw and heard was competent, first-hand testimony. Any conversations between Harris and the elusive "Kitty Cat," or between Jones, the confidential informant, and "Kitty Cat" at that time and place were not hearsay but a first-hand account by an eyewitness of what he saw and heard.
It was error for the court to exclude McDavid's testimony as to what he heard these individuals say during this version of the transaction there at the scene. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); United States v. Cintolo, 818 F.2d 980 (1st Cir.1987); United States v. Payden, 622 F. Supp. 915 (D.C.N.Y. 1985); Graves v. State, 492 So.2d 562 (Miss. 1986); West v. State, 485 So.2d 681 (Miss. 1985).

III. LEADING QUESTIONS
In this assignment of error, McDavid contends that the trial court erred in allowing the prosecution to repeatedly ask and its witnesses to answer leading questions. McDavid first challenges the prosecution's use of leading questions in the direct examination of Detective Harris:
[BY MR. HEDGEPETH, Assistant District Attorney]
Q. After you parked or after you turned in, where is the first time you saw the defendant, Darrell McDavid? Where did you see him?
BY MR. HOLMES:
Your Honor, we're going to object to the leading. There's been no foundation that Mr. McDavid was seen.
BY THE COURT:
Well, I'll let her answer the question.
Q. I'll tell you what, we'll take care of that problem. Did you see Darrell McDavid that day?
A. Yes, I did.
(T.II. 14).
McDavid also challenges the use of leading questions by the prosecutor when he examined Harris concerning the chain of custody of the cocaine. Another leading question was asked concerning what judicial district in Hinds County the alleged crime took place. McDavid also objected to the following questions during the state's direct examination of Detective Clowers:
[BY MR. HEDGEPETH]
Q. Okay. Officer Clowers, you had never seen Darrell McDavid before this day, I don't believe, had you?
A. No, sir, I had not.
Q. And you were not familiar enough with his voice to be able to 
BY MR. HOLMES:
We object to leading.
Q. Were you familiar enough with his voice to know whether it was him or not at that time?
A. No, sir, I was not.
Q. And even though after you talked to him later, you're still telling us you still couldn't match up the two perfectly?
BY MR. HOLMES:
The same objection to leading questions.
BY THE COURT:
I'll let him answer that question.
Q. Could you match the two voices?
A. The voices were similar, sir.
(T.II. 62-63).
We stated the rule to be applied when reviewing a trial court's decisions regarding leading questions in Whitlock v. State, 419 So.2d 200, 203 (Miss. 1982):

*17 A leading question is one that suggests to the witness the specific answer desired by the examining attorney. [citations omitted] Trial courts are given great discretion in permitting the use of such questions, and unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision. [citations omitted] This is because the harm caused is usually inconsiderable and speculative, and only the trial court was able to observe the demeanor of the witness to determine the harm. [citation omitted].
Whitlock, 419 So.2d at 203. See also Palmer v. State, 427 So.2d 111, 115 (Miss. 1983); Thomas v. State, 217 So.2d 287, 288 (Miss. 1968); Summerville v. State, 207 Miss. 54, 64-65, 41 So.2d 377, 379 (1949).
The harm caused by the leading questions in this case was not inconsiderable and speculative. One of the leading questions dealt with Detective Harris's identification of McDavid and other leading questions dealt with Detective Clowers's identification of McDavid's voice. These improper questions caused significant harm to McDavid since they dealt with the most crucial issue in the case, the identification of McDavid as a participant in the drug transaction.
As set out above, the court erred in allowing the officers to express an opinion that the seller's voice was McDavid's before the proper predicate had been laid, in excluding as McDavid's testimony about the conversation between Harris and "Kitty Cat," and finally in permitting repeated prejudicially leading questions by the prosecution. These errors in combination under the facts of this case require reversal.
REVERSED AND REMANDED FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.