THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 96-KA-00037 COA

**EARL TUCKER**                                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/28/95 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE MCCRORY |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CT I KIDNAPPING: CT II BURGLARY OCC DWG: CT I SENTENCED TO 15 YRS IN THE MDOC SENTENCE TO RUN CONCURRENT WITH CT II; CT II SENTENCED TO 15 YRS IN THE MDOC SENTENCE TO RUN CONCURRENT WITH CT I |
| DISPOSITION: | AFFIRMED - 10/7/97 |
| MOTION FOR REHEARING FILED: | 10/16/97 |
| CERTIORARI FILED: | 11/26/97 |
| MANDATE ISSUED: | 2/24/98 |

BEFORE THOMAS, P.J., KING, AND DIAZ, JJ.

THOMAS, P.J., FOR THE COURT:

Earl Tucker appeals his conviction of kidnaping and burglary of an occupied dwelling raising the following issues as error:

**I. DID THE COURT ERR BY NOT QUASHING THE VENIRE AFTER THE DEFENDANT**

**WAS BROUGHT INTO COURT IN JAIL ATTIRE AND SHACKLED BY HIS HANDS AND FEET?**

**II. WHETHER THE COURT ERRED BY NOT GIVING AN INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF TRESPASS?**

**III. DID THE COURT ERR IN REFUSING TO GIVE AN INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF SIMPLE ASSAULT?**

**IV. DID THE COURT ERR BY ALLOWING IMPROPER CHARACTER EVIDENCE TO BE INTRODUCED TO THE JURY?**

**V. WAS THE DEFENDANT DENIED A FAIR TRIAL BY INFLAMMATORY QUESTIONS AND ARGUMENT BY THE PROSECUTION?**

**VI. DID THE COURT ALLOW IMPROPER HEARSAY EVIDENCE TO BE INTRODUCED TO THE JURY?**

**VII. WHETHER THE STATE PROVED ALL OF THE ELEMENTS OF BURGLARY OF AN OCCUPIED DWELLING BEYOND A REASONABLE DOUBT?**

**VIII. DID THE TRIAL COURT ERR IN ITS RULING ON THE DEFENDANT'S *BATSON v. KENTUCKY* OBJECTION?**

Finding no error, we affirm.

FACTS

In September 1994, Annette Haggard was living in a trailer in Edwards, Mississippi with her four children, Ryan Haggard, age eleven, Valerie Haggard, age eight, Clevon Riley, age nine, and Crystal Tucker, age five. Haggard and Earl Tucker had lived together for some time, but Tucker at the time of the incident was no longer living in the trailer.

On September 17, 1994, Haggard was at home with her four children talking to her cousin on the telephone. While she was on the telephone, Tucker came around to the back of the trailer and yelled at her. She hung up the telephone and dialed 911 but before she could place the call Tucker came around to the front, opened the door, and pulled the telephone out of the wall. Tucker grabbed

Haggard by the neck, drug her out of the trailer, and put her in his automobile. Another individual named Ken Palmer was also in the automobile.

Tucker drove down several country roads and at one point slowed down enough for Haggard to jump out of the automobile, at which time Tucker caught up with her and started beating her. Tucker put her back in the automobile and told Palmer to get in the back seat with her and instructed him to break Haggard's neck if she tried to escape again. Later Tucker stopped the automobile on a bridge and with the aid of Palmer started beating Haggard again. Thereafter, they placed Haggard in the trunk of the automobile.

A short while later, Tucker and Palmer took Haggard out of the trunk, put her back in the automobile, and took her to the Lodge Apartments in Jackson, Mississippi. Tucker forced Haggard to telephone his mother and Haggard's daughter, Ryan, and tell them everything was fine. During this time, Haggard attempted to place a telephone call to 911 but did not speak because Tucker was standing right beside her.

Tucker and Palmer then took Haggard to a body shop on Lynch Street in Jackson, where both Palmer and Tucker worked. Haggard went to use the restroom and as she was coming out, the police arrived.

Ryan Haggard, Annette's oldest daughter, testified. She stated that on September 17, 1994, her mother was talking on the telephone when Tucker arrived. She testified that Tucker knocked on the trailer window and told Haggard he needed to talk with her. Ryan testified that Tucker came around and "snatched" open the door and then pulled the telephone out of the wall. She stated that Tucker grabbed her mother by the neck and dragged Annette out of the house, while she and her sisters and brothers cried. Ryan then plugged the telephone back up and called the police and her grandmother, Mae Willie Tucker, Tucker's mother. Mrs. Tucker took the children to her house. Ryan testified that later that evening Haggard telephoned and said that she was all right. Ryan did not see her mother until the next morning when she noticed that Haggard's eye was puffy, where it had not been before Tucker took Haggard that night.

Ken Palmer testified that he and Tucker, whom he had met about two days before this incident, worked together at a body shop. Palmer accompanied Tucker to the trailer. He testified that Tucker parked the automobile behind the trailer and later came back with Haggard. Palmer stated that Tucker was yelling at Haggard and pulling her to the automobile. He testified that Haggard was not going to the automobile voluntarily.

After Tucker and Haggard got in the back set, Tucker told Palmer to drive the automobile. As Palmer started slowing for a turn, Haggard jumped out of the automobile. Tucker ran after her and proceeded to hit her. Tucker then told Palmer to get in the backseat with Haggard to make sure that she did not run again. Tucker then drove to an area and got Haggard out of the automobile. Tucker then began to beat Haggard. After the beating, Tucker put Haggard in the trunk and the men drove off to an area near a bridge. Tucker then released Haggard from the trunk and intimidated her into having sex with Tucker. After they left the bridge, the men drove to the Lodge Apartments, where Haggard made a telephone call. After she made the call, Palmer testified that Tucker told Haggard that she would not make it to see tomorrow. Finally, after they went to the body shop on Lynch Street, the police arrived. Palmer testified that before the trial he had pled guilty to a charge of trespass and to accessory after the fact of kidnaping.

Detective Eddie Robinson of the Hinds County Sheriff's Department testified that he had been

dispatched to the scene of the crime immediately after it was reported. He testified that when he arrived at the scene all the children were upset and crying. After he calmed Ryan, the eldest daughter, she told him that Tucker had "snatched the door open" and dragged her mother out of the trailer. Robinson found "a crease in the door where it looked like somebody had pulled on it." He then gave a description of Tucker and Haggard to the dispatch to inform other departments to be on the lookout.

Detective Robinson testified that Tucker's sister had received a telephone call from Haggard. Because the telephone had a caller identification box, Tucker's sister was able to tell where Haggard was located when she called. This information led Detective Robinson to the Lodge Apartments in Jackson. Someone at that location told the Detective that Tucker may be headed down to a vacant car wash on Lynch Street. At the car wash, Detective Robinson apprehended Tucker and Palmer and shortly after that Robinson found Haggard. After Detective Robinson's testimony, the State rested.

The first witness for the defense was Lionel Tucker, Tucker's second cousin. He testified that at the time of the incident he had been renting this trailer to Haggard. He stated that he gave both Haggard and Tucker keys to the trailer, but on cross-examination, he admitted that he did not know whether Tucker still had a key.

Next to testify for the defense was Mary Tucker, Tucker's sister. On direct she testified that in her opinion Tucker was not a violent person. During cross-examination, the State asked her whether she remembered that her brother had been arrested for assault on a police officer and simple assault. She testified that she remembered his arrests, but that no one had been a saint all their lives.

Last to testify was Peggy West, a person who had dated Tucker for about a year and a half. She stated that Tucker treated her nice and that he had never been violent with her. On cross-examination she testified that she did not know how Tucker treated Haggard.

The jury found Tucker guilty of kidnaping and burglary of an occupied dwelling.

ANALYSIS

I.

**DID THE COURT ERR BY NOT QUASHING THE VENIRE AFTER THE DEFENDANT WAS BROUGHT INTO COURT IN JAIL ATTIRE AND SHACKLED BY HIS HANDS AND FEET?**

Before the beginning of voir dire, while the entire venire was seated in the courtroom, Tucker was brought through the courtroom wearing an orange jump-suit and shackles on his hands and feet. Tucker was led by an armed guard down the middle aisle of the courtroom and taken to a room to the right of and behind the bench, where he changed clothes. Defense counsel moved to quash the venire, but the lower court denied this request. Later, after the jury selection, but before opening statements, the court offered to instruct the jury that they should disregard Tucker being displayed in

jail attire and handcuffs. The court did not do so because defense counsel was concerned that any further comment would draw more attention to the event.

In *Rush v. State*, 301 So. 2d 297 (Miss. 1974), the deputy sheriff brought the defendant into the courtroom in handcuffs in the presence of members of the special venire. *Id.* at 300. Upon the request of defense counsel, the handcuffs were immediately removed. *Id.* The Mississippi Supreme Court stated:

[i]t is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner. Whether that ought to be done is in the discretion of the court, based upon reasonable grounds for apprehension. But, if this right of the accused is violated, it may be ground for the reversal of a judgment of conviction.

*Id.* However, the court felt that "the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for reversal." *Id.*

In a later case, *Hickson v. State*, 472 So. 2d 379 (Miss. 1985), the defendant was led into the courtroom in handcuffs and was required to sit handcuffed in the view of the unselected jurors between thirty minutes to an hour. *Id.* at 382-83. The court stated that there is a "substantial danger of destruction in the minds of the jury of the presumption of innocence where the accused is required to wear prison garb, is handcuffed or otherwise shackled." *Id.* at 383 (citations omitted). The court in *Hickson*, however, did not decide whether this was reversible error because it determined that another issue warranted reversal. *Id.* The court did admonish the trial court on remand to respect the defendant's presumption of innocence. *Id.*

Here, the venire saw Tucker in shackles during the process of his coming into court. As in *Rush* above, it appears that this incident is not so egregious as to deprive Tucker of a fair trial. At the most, Tucker can show no more than a "technical violation of the rule prohibiting shackling." *Rush*, 301 So. 2d at 300. Accordingly, Tucker's first argument is without merit.

## II.

### WHETHER THE COURT ERRED BY NOT GIVING AN INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF TRESPASS?

Tucker was charged under the indictment with the crime of burglary of an occupied dwelling. Tucker requested a lesser-included jury instruction for trespass, which the circuit court denied. He complains that the exclusion of the lesser-included offense was reversible error. "Trespass is necessarily a constituent offense of every burglary." *Gillum v. State*, 468 So. 2d 856, 861 (Miss. 1985) (citation omitted).

"A lesser-included offense instruction is required 'where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt.'" *Thorson v. State*, 653 So. 2d 876, 893 (Miss. 1994) (quoting *Mackabee v. State*, 575 So. 2d 16, 23 (Miss. 1990)). Where Tucker has

requested that the jury be instructed on a lesser charge, this Court will look at the evidence in the light most favorable to Tucker in determining whether such an instruction is warranted. *Davis v. State*, 684 So. 2d 643, 656 (Miss. 1996). A lesser-included offense instruction is proper only if the record supports finding an evidentiary basis for the instruction. *Davis*, 684 So. 2d at 657; *Ormond v. State*, 599 So. 2d 951, 959 (Miss. 1992); *Mease v. State*, 539 So. 2d 1324, 1330 (Miss. 1989).

Tucker states that he had at least two viable explanations for entering the trailer, first that he had a key and thus had a right to be on the premises, and second that his child was living there. Tucker's argument holds no merit. First, it was contested whether Tucker still had a key. Annette Haggard testified that he no longer had a key and Lionel Tucker, the owner of the trailer, testified that he did not know whether Tucker still had a key. Second, testimony clearly showed that Tucker was not entering the trailer to see his child. Everyone involved testified that Tucker parked his automobile in a covert location, "snatched" the door open, immediately grabbed Haggard by her neck, and dragged her to the automobile.

Tucker's argument also fails for another reason. His defense was that he entered the trailer with express or implied permission and thus, was not a trespasser; he could not be guilty of trespass. Because no set of facts would justify a rational fact-finder of deciding Tucker not guilty of burglary but guilty of trespass, the court properly denied the lesser-included offense instruction. *Deal v. State*, 589 So. 2d 1256, 1260 (Miss. 1991). There was no evidence to suggest that Tucker was a casual visitor or that he entered for any purpose other then to leave with Haggard. Therefore, the facts did not warrant a trespass instruction.

### III.

### DID THE COURT ERR IN REFUSING TO GIVE AN INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF SIMPLE ASSAULT?

Tucker proposed a simple assault instruction, but the court denied the request stating that it was not supported by the evidence. The trial court is required to grant a lesser-included offense instruction where the evidence is such that a rational fact-finder could find the defendant not guilty of the greater offense, but guilty of the lesser. *Rowland v. State*, 531 So. 2d 627, 631-32 (Miss. 1988).

Tucker argues that Haggard was not beaten badly enough to require medical treatment and that there was no evidence of secret confinement, therefore the circuit court should have granted him the lesser-included offense instruction of simple assault. Tucker's argument is wholly without merit. Haggard was badly beaten, as the pictures disclosed to the jury below clearly show. Second, Haggard was secreted away in an automobile driven by Tucker and later thrown in the trunk of the automobile. There was clear proof beyond a reasonable doubt that Tucker kidnapped Haggard.

### IV.

## DID THE COURT ERR BY ALLOWING IMPROPER CHARACTER EVIDENCE TO BE INTRODUCED TO THE JURY?

The defense called Mary Tucker, Tucker's sister, to testify, in part, as a character witness. During his direct examination of Mary Tucker the following took place:

**Question:** Can you tell us generally what your brother's character is in regards to violence or treatment of other people?

**By Mr. Mayfield:** Objection to that. That's not--that's not the proper--proper form of the question.

**By Mr. Holmes:** I don't know how else to ask it, Your Honor.

**By the Court:** Restate your question again and let me see.

**Question:** Do you--do you have an opinion as to your brother's character or propensity for violence and the way he treats people?

**Answer:** Well, yes, sir, I do.

**Question:** Tell us what that is, please.

**Answer:** Well, my opinion of my brother is he--he is not a violent person--

**By Mr. Mayfield:** Now, your Honor, that's not--that's not the proper way to respond to the question. That's not responsive.

**By the Court:** All right. Sustain the objection.

**By Mr. Holmes:** She was stating what her opinion was.

**By Mr. Mayfield:** Your Honor, I know what she was saying, and that's not the way she's required to answer it.

**By The Court:** You need to get a yes or no response to the question.

**Question:** Do you have an opinion?

**Answer:** Well, yes, sir.

**Question:** Okay. And what is that opinion?

**Answer:** As far as if he's violent or whatever?

**Question:** Yes.

**Answer:** Like I said, I don't feel like he's a violent person. He hasn't hurt anybody that I knows (sic) of

**By Mr. Mayfield:** Your Honor--

**Question:** And what do you base that opinion on--

**By Mr. Mayfield:** Your Honor, could--I'm gonna object to this now.

**By the Court:** Yes, sir. The objection will be sustained.

**By Mr. Holmes:** Your Honor, I'd like to [sic] heard outside the presence

of the jury.

The court explained to defense counsel outside the presence of the jury, "You're entitled to ask her if she has an opinion, and if so, is it good or bad. I don't think you're entitled to go into specific instances." Subsequently the following transpired, outside the presence of the jury:

**By Mr. Mayfield:** Excuse me, Your Honor. Let me make it clear . . . Rule 4.40 [sic] permits an inquiry of this nature, but . . . it's got to be a case where . . . a trait of character is relevant, and we concede--in fact, we agree that it's relevant; but what she's not permitted to do is deliver a dissertation as to what a sweet, nice guy she thinks her brother is. Your Honor is absolutely correct; she's limited to his specific reputation for--her opinion with respect to his propensity for peace or violence, and no more. She can't make a speech, and that's what my objection is.

. . . .

**By Mr. Mayfield:** And, Your Honor, if I could, before they come back, I anticipate an objection pursuant to--since he asked that, and it's been answered, and I assume he's gonna maybe ask it one

more time, I anticipate he's gonna object when I start asking her about has she heard about his prior convictions, and I want to make it clear that I'm relying on 4.05(b) as specific authority to permit me to do that. . . .

Tucker's attorney subsequently objected to the use of specific instances of conduct, which was overruled. Thereafter, on cross-examination, the prosecutor asked Mary Tucker whether she had heard that on December 19, 1984 the defendant had been arrested for assault on a police officer; that on March 3, 1987 he had been arrested for assault; and that on November 21, 1992 he had been arrested for unlawful use of a weapon. She replied that she knew of all three instances.

Tucker argues that because of the State's objections during direct examination, the jury heard no evidence of the defendant's character and that the court erroneously allowed the prosecutor to introduce evidence of alleged specific bad acts and arrest for which there was no evidence of conviction. Tucker's argument is misplaced. The court sustained the prosecutor's objections to Mary Tucker going into detail of Earl Tucker's character. She was able to give her opinion as to his character. Second, under Mississippi Rule of Evidence 404(a), once Tucker placed his character at issue, the State was able to rebut his character with specific instances of conduct under Mississippi Rule of Evidence 405(a). "A criminal defendant can offer his good character into evidence; however, the prosecution can then rebut the defendant's evidence of character." *Davis v. State*, 660 So. 2d 1228, 1253 (Miss. 1995) (citations omitted). Therefore, Tucker's fourth assignment of error is without merit.

## V.

### WAS THE DEFENDANT DENIED A FAIR TRIAL BY INFLAMMATORY QUESTIONS AND ARGUMENT BY THE PROSECUTION?
Tucker suggests that he did not receive a fair trial because of irrelevant, inflammatory, and prejudicial questions and arguments from the prosecutor. Tucker asks this Court to look at four particular instances of what he alleges arises to prosecutorial misconduct.

### A. Inflammatory Leading Question

The first instance of alleged prosecutorial misconduct occurred when the assistant district attorney asked Ryan, Annette Haggard's daughter, on redirect examination, "Was she [Earl Tucker's mother] happy about Earl taking your mother out?" Tucker's attorney objected to the relevancy of the question. The objection was overruled.

Tucker states that the question was meant to inject emotion into the trial and thereby prejudice the jury violating the fair trial standard that "no one be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudices, passion, [and] excitement.'" *Fuselier v. State*, 468 So. 2d 45, 52 (Miss. 1985) (quoting *Shepherd v. Maxwell*, 384 U.S. 333, 350 (1966)) (quoting *Chambers v. Florida*, 309 U.S. 227, 236-37 (1940)).

On direct examination of Ryan, she testified that after Tucker dragged her mother out of the house, she had telephoned her grandmother, who was actually Tucker's mother, Mae Willie Tucker. On

cross-examination, the defense asked several questions focusing on the familial nature of this incident, inferring that this episode was a family matter. The State submits that the prosecutor's question above was a fair response to the defendant's tactic on cross-examination. We agree. In *Hogan v. State*, 580 So. 2d 1275 (Miss. 1991), the Mississippi Supreme Court stated that when "the defense attorney inquires into a subject on cross-examination of the State's witness, the prosecutor on [redirect] is unquestionably entitled to elaborate on the matter." *Hogan*, 580 So. 2d at 1278 (quoting *Crenshaw v. State*, 520 So. 2d 131, 133 (Miss. 1988)). The questions propounded by the prosecutor and the testimony elicited were well within the bounds of proper redirect. Under the facts of this case, this Court perceives no error in the trial court's admission of the testimony in question.

### B. Inflammatory Leading Question

Tucker argues that certain questions asked by the prosecution were prejudicial leading questions. The prosecutor asked of Haggard:

**Question:** Did he make any threats to you there at the shop, Earl Tucker?

**Answer:** No, he didn't make no threats there.

**Question:** Do you recall giving a statement earlier? Do you recall at any time whether

or not this defendant made any references to hanging you?

**By Mr. Holmes:** Object to leading, your Honor.

**By the Court:** Try not to lead your witness.

**By Ms. Anderson:** Yes, your Honor.

**Question:** Do you recall any such threats?

**Answer:** Yeah--

**Question:** Or any other threats? What were those threats?

**Answer:** (No audible response.)

Tucker argues that the use of the above leading question was allowed in error and resulted in reversible error. "Trial courts are given great discretion in permitting the use of [leading] questions, and unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision." *Whitlock v. State*, 419 So. 2d 200, 203 (Miss. 1982).

Tucker cites *McDavid v. State*, 594 So. 2d 12, 16-17 (Miss. 1992) and *Whitlock v. State*, 419 So. 2d 200, 203 (Miss. 1982), as support for his proposition. Tucker also cites another case, *Williams v. State*, 539 So. 2d 1049 (Miss. 1989), which deals with the prosecution's repeated reference to evidence previously ruled inadmissible, which we find inapplicable here. In *McDavid*, the prosecution repeatedly asked its witnesses leading questions. *McDavid*, 594 So. 2d at 16. The Court found that two of the asked and answered leading questions caused significant harm to McDavid since they dealt with the most crucial issue in the case. *Id.* at 17.

In *Whitlock*, the prosecution elicited, by leading questions, certain information from the defendant's friend about conversations with the defendant concerning the alleged crime. *Whitlock*, 419 So. 2d at 203. The supreme court did not reverse the lower court, finding that the evidence about the conversations could not have overcome or affected the substantial evidence of guilt in that case. *Id.*

We find that Tucker's reliance on *McDavid* is misplaced, as this one instance of leading did not cause significant harm to Tucker and did not deal with the most crucial issue in the case. As in the *Whitlock* case cited by Tucker, it does not appear that the use of the above question denied Tucker a fair trial, as there was substantial evidence upon which Tucker could be convicted. There was no manifest abuse of discretion in this instance.

## C. Improper Closing Argument

Tucker contends that there were several improper closing arguments by the prosecution. First, Tucker objected to certain statements made by assistant district attorney, Ms. Anderson, during her closing argument. Mr. Holmes then asked the trial judge to instruct the jury to disregard part of her argument. The court sustained the objection and instructed the jury to disregard Ms. Anderson's statement. "It is presumed that the jury follows the judge's instructions and ignores comments that have been objected to and sustained by the judge." *Davis v. State*, 660 So. 2d 1228, 1253 (Miss. 1995).

## D. Improper Closing Argument

Another incident of which Tucker complains is as follows:

**By Mr. Mayfield:** Let me tell you something. For too long, criminals like this have dictated the type of society that we live in. The good people don't. *Don't y'all think that it's time that the decent law abiding people start telling criminals how to act*?

**By Mr. Holmes:** We are going to object to that, your Honor.

**By Mr. Mayfield continuing:** Don't you think it is . . .

**By the Court:** Overruled.

**By Mr. Mayfield:** *Don't y'all think it's time y'all start tell people like him how to act*? Did it make

you mad what he did? Did it offend you? It did me.

**By Mr. Holmes:** Objection, your Honor. Appealing for sympathy and emotion.

**By the Court:** Alright. Be overruled.

Tucker argues that the Mississippi Supreme Court has condemned the kind of argument that curries favor with the jury and suggests that the jury is somehow linked to the State's prosecution. We do not agree with Tucker that this would suggest that the jury is somehow linked to the State. Rather, we feel the above argument is the "send a message" argument. This Court, and the Mississippi Supreme Court, has consistently warned prosecutors to refrain from such argument. In *Hunter v. State*, 684 So. 2d 625 (Miss. 1996), the Mississippi Supreme Court stated that the court

has repeatedly cautioned prosecutors not to use this argument. *Chase v. State*, 645 So. 2d 829, 854 (Miss. 1994); *Williams v. State*, 522 So. 2d 201, 209 (Miss. 1988); *Carleton v. State*, 425 So. 2d 1036, 1039 (Miss. 1983). Indeed, "[t]he function of the jury is to weigh the evidence and determine the facts . . . . Mississippi jurors are not message boys." For this reason, the use of the "send a message" argument should be avoided on remand.

*Id.* at 637. The supreme court in *Hunter* did not reverse based on the prosecutor's comments, but three members of the court in separate concurring opinions expressed the view that the court should have held this "send a message" reversible error. In spite of the dissenting view in *Hunter*, in no case cited or found has the supreme court reversed based on this form of closing argument. In *Fulgham v. State,* 386 So. 2d 1099 (Miss. 1980), which was reversed on other grounds, the supreme court considered an argument in which the jury was depicted as the final link in the chain of law enforcement and stated, "We do not think that this assignment of error standing alone would require reversal." *Id.* at 1101. Accordingly, we will not reverse on this issue standing alone.

## VI.

### DID THE COURT ALLOW IMPROPER HEARSAY EVIDENCE TO BE

### INTRODUCED TO THE JURY?

Detective Eddie Robinson of the Hinds County Sheriff's Department was on patrol on the evening of the incident in question near Bolton, Mississippi. Detective Robinson stated that when he arrived on the scene, he took a statement from Ryan Haggard, Annette Haggard's daughter, and over objection to hearsay, Detective Robinson was allowed to testify as to what Ryan Haggard told him.

Tucker's contention is that the above elicited testimony was improper hearsay. The State submits the hearsay objections were properly overruled pursuant to Mississippi Rule of Evidence 803(2), the excited utterance exception.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing,

offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). Hearsay evidence is inadmissible unless it falls within a known exception. An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition." M.R.E. 803(2). This exception is broader in scope than the "present sense impression" exception in that the statement need only "relate" to the startling event as opposed to "describing" it. M.R.E. 803(2) cmt 2. "[T]he competency of excited utterances is a matter largely discretionary with our trial courts. . . ." *Davis v. State*, 611 So. 2d 906, 914 (Miss. 1992).

The trial court correctly found that the statement was admissible under the excited utterance exceptions to the rule against hearsay, since it occurred shortly after the event, while Ryan was still under the stress of the excitement.

Tucker next challenges the court's ruling with respect to the following exchange taken during the State's direct examination of Robinson:

**Question:** And did you determine what this number was based on the Caller ID equipment?

**Answer:** Yes, I did. I had SO to cross-reference that number. It came back to the Lodge Apartments, located on West Highland Drive--

**By Mr. Holmes:** Object to hearsay. This is hearsay, Your Honor.

**By Mr. Mayfield:** Your Honor, this is not offered for the truth of the

matter asserted.

**By Mr. Holmes:** If it's not, I don't know what it is offered for, Your

Honor.

**Question:** As a consequence--

**By the Court:** Just let him . . . testify as to what he did as a result of

getting the phone number.

Tucker argues that this is rank hearsay. The State argues that the effect of this testimony was to show information acted upon, not to prove the truth of the matter asserted. *Knight v. State*, 601 So. 2d 403, 406 (Miss. 1992). We agree. Accordingly, this issue has no merit.

**VII.**

## WHETHER THE STATE PROVED ALL OF THE ELEMENTS OF BURGLARY OF AN OCCUPIED DWELLING BEYOND A REASONABLE DOUBT?

In Tucker's seventh assigned issue of error, he argues that the State failed to prove the two essential elements of burglary of an occupied dwelling of another. "The crime of burglary has two essential elements, the unlawful breaking and entering and the intent to commit some crime once entry has been gained." *Murphy v. State*, 566 So. 2d 1201, 1204 (Miss. 1990). "Both of these elements must be proved as charged in the indictment." *Alford v. State*, 656 So. 2d 1186, 1189 (Miss. 1995) (citing *Brumfield v. State*, 206 Miss. 506, 40 So. 2d 268 (1949)). "Any effort, however slight, such as the turning of a door knob to enter, constitutes a breaking." *Alford*, 656 So. 2d at 1189.

Tucker states he had a key to the trailer, that he and Haggard had lived together until shortly before the incident, and he and Haggard had a child. He claims that he had both express and implied authority to enter the house because he had a key. Therefore the element of breaking and entering the house of another was not proven. A reading of the record does not support Tucker's argument. Haggard testified that Tucker no longer had any belongings at the trailer, that he no longer had a key to the trailer, that he was not paying rent, and that he did not have permission to enter the trailer. Ryan Haggard testified that Tucker was no longer living there, and that no one rightfully present wished him to enter the trailer. Both Haggard and her daughter testified that Tucker "snatched" the door open, yanked the telephone out of the wall, and forcibly removed Haggard from the trailer. Lionel Tucker testified that he had given both Tucker and Haggard keys, but he did not know whether Tucker still had one. The record clearly supports the jury's determination that Tucker did not have any authority to enter the trailer, and he wilfully and unlawfully broke and entered in the dwelling with the intent to commit the crime of kidnaping. For these reasons, Tucker's seventh issue should be denied.

## VIII.

## DID THE TRIAL COURT ERR IN ITS RULING ON THE DEFENDANT'S *BATSON v. KENTUCKY* OBJECTION?

Tucker invoked the *Batson* rule prior to selection of the jury. He argues that the trial court violated *Batson v. Kentucky*, 476 U.S. 79 (1986), in accepting the State's reason for peremptorily challenging venire members Roosevelt Hunt and David Daniels, black males. In *Batson*, the United States Supreme Court established a three-step process for evaluating a claim that the State has exercised its peremptory challenges in a racially discriminatory manner. First, the defendant must establish a prima facie case of purposeful discrimination in the selection of the jury. Once the defendant establishes a prima facie case, the burden shifts to the State to articulate a race-neutral reason for challenging each of the venire persons in question. Finally, the trial judge must consider those explanations and determine whether the defendant has met his burden of establishing purposeful discrimination. *Batson*, 476 U.S. at 96-98.

A prima facie showing of discrimination under *Batson* requires the defendant to demonstrate that relevant circumstances in the case raise an inference that the prosecutor exercised peremptory challenges to remove venire persons based on their race. *Id.* at 96. To make a prima facie showing of purposeful discrimination in the selection of a jury, a defendant must establish the following:

1. That his is a member of a "cognizable racial group";

2. That the prosecutor has exercised peremptory challenges toward the elimination of venire men of his race; and

3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989) (citing *Batson*, 476 U.S. at 96-97; *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987)).

The first factor to consider is whether the defendant and the excluded panel members share the same race. Here, Tucker, Hunt, and Daniels are all members of the black race. The next factor to be considered is whether there is a disproportionate use of peremptory challenges by the prosecution against black panel members. At the outset we must note that it appears that Tucker has failed to establish a prima facie case that the prosecution peremptorily struck black venire persons in a patently discriminatory manner. The record shows that the State exercised only five challenges against members of the black race. The State had strikes left, which it did not use, and there were other members of the black race on the jury.

Tucker failed to make out a prima facie showing that "the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities." *Conerly*, 544 So. 2d at 1372. Nevertheless, the lower court nonetheless required the State to offer their race-neutral reasons for the challenge against Hunt and Daniels. In *Batson*, the Court stated that once the defendant makes a prima facie showing, the burden shifts to the State "to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97 (footnote omitted).

The State challenged panel member Hunt on several bases: first, he lived in the immediate area in which the crime was committed; second, he was not responsive; and third, his questionnaire was incomplete. The State challenged panel member Daniels for two reasons: first, that he was not responsive; and second, he had submitted an incomplete questionnaire. Tucker argued that both Hunt and Daniels's questionnaires were complete. The trial court allowed the challenges. The trial court, experienced in conducting voir dire and having observed the demeanor of Hunt and Daniels and the other prospective jurors during the voir dire proceedings, was in the best posture to decide whether this reason given by the State was legitimate rather than pretextual. This Court has held that a circuit court's decision in this matter is entitled to great deference, and we will reverse the circuit court's *Batson* findings only where those findings are clearly erroneous and against the overwhelming weight of the evidence. *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987).

Due to the fact that Tucker failed to raise a prima facie case of discrimination and the court's finding that the challenges were race-neutral is not clearly erroneous, Tucker's last assignment of error has no merit.

**THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION ON COUNT I OF KIDNAPING AND SENTENCE OF FIFTEEN (15) YEARS; COUNT II OF CONVICTION OF BURGLARY OF AN OCCUPIED DWELLING AND SENTENCE OF FIFTEEN (15) YEARS, WITH SENTENCES TO RUN CONCURRENTLY, ALL IN THE**

**CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**


**BRIDGES, C.J., McMILLIN, P.J., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.**