## IN THE COURT OF APPEALS

## OF THE

## STATE OF MISSISSIPPI

### NO. 98-KA-00183-COA

**RODERICK PRICE A/K/A RODERICK P. PRICE**

**A/K/A RODERICK D. PRICE**                                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                               **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/09/1998 |
| TRIAL JUDGE: | HON. WARREN ASHLEY HINES |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MARIE WILSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: PAT S. FLYNN |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | 01/09/1998: CONVICTED ON CT I BURGLARY OF A DWELLING HOUSE; CT II BURGLARY OF A DWELLING HOUSE; CT III RAPE; CT IV SEXUAL BATTERY. SENTENCED ON CTS I & II TO 25 YEARS; ON CT III TO 45 YEARS; ON CT IV TO 30 YEARS IN THE CUSTODY OF THE MDOC, ALL TO RUN CONSECUTIVELY TO EACH OTHER; PAY COURT COSTS OF $252.50, AND BOND FEE OF $20. |
| DISPOSITION: | AFFIRMED - 06/29/99 |
| MOTION FOR REHEARING FILED: | |
| CERTIORARI FILED: | 10/25/99; dismissed 01/27/2000 |
| MANDATE ISSUED: | 7/20/99 |

BEFORE SOUTHWICK, P.J., COLEMAN, AND THOMAS, JJ.

SOUTHWICK, P.J., FOR THE COURT:

¶1. Roderick Price was convicted of rape, sexual battery, and burglary by a Washington County Circuit Court jury. On appeal Price alleges that the trial court allowed the State to ask leading questions of the victim. Under these facts we do not find this to be reversible error. We affirm.

## FACTS

¶2. Roderick Price was arrested by a Greenville police officer during the early morning hours of February 6, 1997. An officer who responded to a report of a burglary in progress was directed to a specific apartment, from which he soon saw a man exiting with a hammer in one hand and a hat in the other. The officer identified himself and told the man to lie on the ground. The suspect fled but was caught after a short chase. Price was the man that the officer caught.

¶3. Subsequent investigation indicated that more had occurred that night than two burglaries. The apartment from which the suspect had left just before being arrested was occupied by an elderly woman who showed signs of having been sexually assaulted as well as having suffered injuries to her mouth. Ultimately, charges were brought against Price for two counts of burglary, one count of rape, and one count of sexual battery. He was convicted on all counts.

## DISCUSSION

### Issue: The State's asking leading questions of the victim

¶4. The fact that the State asked leading questions is not contested. Rather, the State argues that under the circumstances present in this case, leading questions of the victim were permissible.

¶5. The trial judge allowed the questioning under Rule 611(c) of the Mississippi Rules of Evidence and its comment. The rule states in part that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." M.R.E 611(c). The comment to this rule elaborates. Leading questions might be appropriate in cases where children are testifying, cases "with the witness whose recollection is exhausted and with the witness who has communication difficulties." M.R.E. 611(c) cmt.

¶6. Meaningful communication difficulties may result from a variety of causes that include embarrassment or shame. Regarding leading questions during a child's testimony, our supreme court approvingly quoted a federal decision that stated "[t]he trial court's ruling deserves deference because the court was in the best position to evaluate the emotional condition of the child witness and his hesitancy to testify." *Ivy v. State*, 522 So. 2d 740, 742 (Miss. 1988), quoting *United v. Nabors*, 762 F.2d 642, 650-651 (8th Cir.1985). While the supreme court in referring to emotional condition and hesitancy to testify mentioned that its "holding [was] consistent with pre-rules law that the trial judge has broad discretion in passing on the form of questions asked minors," there is no reason to limit the point to testimony by children. Those at the opposite extreme in age may need similar solicitude. The supreme court well before the Rules of Evidence were adopted made just that point in holding that "latitude is allowed to the trial court in the matter of leading questions to a witness" who was 86 years old and partially deaf. *Bruce v. State*, 169 Miss. 355, 152 So. 490, 491 (1934).

¶7. The record reveals that the victim was reluctant to discuss in open court the sexual attack she had suffered. Her difficulty in testifying about these facts was evident almost from the moment the prosecution broached the subject on direct examination.

Q. Okay. And when the man asked you for your money and you said it was in the bank, what did he do then?

A. I hate to tell what he did.

Q. I know, I know this is hard. What . . what did you use to sleep in?

A. I sleep in a gown and things.

Q. Okay, keep your voice up for me. Okay, look -- just look at me; okay?

* * *

Q. Okay. And when . . when the man asked for your-- After the man asked for your money, did he do anything?

A. Yes, ma'am.

Q. Okay. And that's the part that's kind of hard to say, isn't it?

A. Sho' is. I hate to do that.

Q. Okay.

A. She had -- she told them what he had done because I was ashamed to tell her.

Q. You were ashamed to tell?

A. I sho' was.

Q. Okay, well you know you don't have anything to be ashamed about; is that what -

A. I'm ashamed to do that -- say that though.

Q. Okay, I know it's hard for you.

A. Yes, ma'am.

¶8. The victim subsequently denied that anything happened after her assailant choked her and broke her teeth.

Q. Okay. And did he do anything else to you after he choked you and broke your teeth?

A. He didn't do no thing before no Police come.

Q. Okay.

A. Right.

Q. I'm sorry, I didn't mean to interrupt you. The part that is so hard to say, did he do something to your private part?

MS. WILSON: Your honor? [What may have been the start of an objection was not pursued.]

A. No, sho' didn't.

¶9. The victim denied being taken to the hospital. She again denied it even when the State specifically mentioned the Delta Regional Medical Center. The State asked a third time about her going to the hospital and at this point she remembered being taken to the "Delta Medical Center." Her testimony regarding how her clothing became torn was also somewhat contradictory.

Q. Okay. How about your nightgown; did anything happen to your nightgown?

A. I didn't fool with them. He didn't fool with it.

Q. Okay, how about your underpants; did anything happen to them?

A. Nothing but what I had on -

Q. Okay, what happened -

A. --sleeping in, that's what he tore up. That's all he tore up in there.

Q. Okay, what . . what did he tear up? When you said what you were sleeping in got torn up, what did he tear up?

A. Nothing else, just had that hammer talking about he'd kill me, but he didn't do it.

¶10. Several sentences later, the defense counsel objected to the leading of the witness. This was nine pages into the direct examination of the victim. An apparent start of an earlier objection was dropped, possibly because the State switched topics. There had been considerable leading of the witness prior to the first articulated objection. This objection was untimely as to the previous testimony resulting from leading questions, but we do not find the entire issue waived.

¶11. Citing Rule 611(c) and its comment, the trial judge said that "I think that in this case it's evident that the woman is embarrassed by the testimony and it's evident that she's uncomfortable in the courtroom and that she's much more so than most of the witnesses that we see and that due to her age. She's frail, and I think under these circumstances I find that she does have communication difficulties and so I'm going to allow some limited leading of the witness." The judge, however, affirmed defense counsel's objection to the State repeating the victim's answers.

¶12. Continued testimony by the victim further reveled her embarrassment and extreme reluctance to talk about the attack.

Q. Okay. Now you said that your underpants were torn; is that right?

A. Sho' was, they was down on the floor.

Q. And how did-

A. They were torn.

Q. I'm sorry. How did they get torn?

A. He tore them up, that's right. He tore them up and laid them down there on the floor.

Q. And after your underpants were torn up, what did he do? I know this is difficult and I'm sorry. We'll get this over quickly for you; okay?

A. Yes ma'am.

Q. After your underpants were torn up, what did the man do?

A. The Police come and got him and they seed him there.

Q. Okay, between the time-- What happened right after? Did anything happen to your body?

A. Yes, ma'am.

Q. I know, look -- just look at me and forget about anybody else in the courtroom.

A. Yes, ma'am.

Q. Can you do that?

A. Yes, ma'am.

Q. Just look at me. Okay. What happened to your body after your underpants got torn up?

A. Nothing happened to it.

Q. Okay. Did any -- did the man do something to your area around your underpants?

A. Around . . around my-- I don't know what you talking about.

Q. I'm sorry, I didn't hear you.

A. I don't know what you talking about.

Q. Other than the area-- You said that your mouth -- earlier you said that your mouth got hurt?

A. Yeah, when he broke my teethes, uh-hmmmmm. Yes, Lord.

Q. Did anything else happen to your mouth?

A. No, it just got sore, it just got sore.

Q. Got sore?

A. Got sore, sho' did.

Q. Did the man put anything in your mouth?

A. He sho' do, but I hate to say this.

Q. I know you do.

A. Yea, I hate to say it.

Q. I know, I know.

A. He put the wrong thing.

Q. I'm sorry?

A. I hate to call it. Everybody call it-- Erma, she called it out, I didn't.

Q. I know you don't like to say it.

A. I say that, I sho' don't.

Q. Can you say it just one time for us? What . . what did-- What went in your mouth?

A. I hate to say it. I told you earlier I hate to say it. The wrong thing.

* * *

Q. Okay, you told Erma; can you look at me and just -- and tell me? Remember you and I talked the other day-

A. Yes-

Q. --at the nursing home?

A. Yes, ma'am, sho' did.

Q. Okay, just look at me and tell me what went in your mouth.

A. I thought I told y'all that -- told you that.

Q. You did, but you have-

A. You want me to tell it again, huh?

Q. One more time. I won't ask you again if you'll tell me one more time.

A. I hate to. I'm ashamed to call that out. That's the truth.

Q. I know.

A. Erma called it out. That's the reason I was ashamed to say that. I just said his penis.

¶13. Additional questions caused the victim to acknowledge the other sexual acts that Price had committed, each time making the statements with considerable difficulty. Responding to what definitely were leading questions, she answered affirmatively that Price had placed his penis both in her mouth and had "ravished" her. That word means to "rape" or "violate."

¶14. Price points out that the testimony on penetration was critical to the charges of rape and sexual battery and that without the prosecution's leading, especially on the issue of penetration, there would have been insufficient evidence to sustain a conviction on either of those counts. Price cites two cases. Both stand for the proposition that where the harm caused by leading questions is neither speculative nor inconsiderable, reversal is warranted. *Whitlock v. State*, 419 So. 2d 200, 203 (Miss. 1982); *McDavid v. State*, 594 So. 2d 12, 16-17 (Miss. 1992).

¶15. Neither case addressed the issue with which we are faced, namely a person who by age or otherwise falls within the exception permitting leading questions under the evidentiary rule. The State was attempting to draw out responses from an understandably embarrassed elderly witness. There is no indication from the manner in which this issue arose that the prosecution was creating the answers to the questions, but only encouraging the elderly witness to get passed her embarrassment and acknowledge the details of the crime. The supreme court recently decided a case involving questioning of a child who had been sexually battered in a manner similar to the victim here. *Keyes v. State*, 97-KA-01448-SCT (Miss. 1999). The supreme court permitted the use of leading questions, citing the child's age "and the circumstances surrounding the case." *Id.* at (¶9).

¶16. Here the victim was an eighty-three year old woman, who was beaten, raped, and sexually battered by her assailant. These circumstances likely made her just as traumatized and bewildered as a child at having to recount details of the crime. Within the limits of this evidentiary rule, leading questions may be allowed. Unless there has been an abuse of discretion that prejudices the complaining party, there are no grounds for reversal. *McFarland v. State*, 707 So. 2d 166, 175 (Miss. 1997). What occurred in Price's trial fits within the exception to the general prohibition of leading question on direct examination. M.R.E. 611 (c).

¶17. **THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT AND CONVICTIONS ON COUNT 1 BURGLARY OF A DWELLING HOUSE, COUNT II BURGLARY OF A DWELLING HOUSE, COUNT III RAPE, AND COUNT IV SEXUAL BATTERY, AND SENTENCES OF TWENTY -FIVE YEARS ON COUNT I, TWENTY-FIVE YEARS ON COUNT II, FORTY-FIVE YEARS ON COUNT III, AND THIRTY YEARS ON COUNT IV, ALL TO RUN CONSECUTIVELY AND TO BE SERVED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED.**

**COSTS OF THIS APPEAL ARE TAXED TO WASHINGTON COUNTY.**

**McMILLIN, C.J., KING, P.J., COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.**

**BRIDGES, J., NOT PARTICIPATING.**