[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1092 
¶ 1. Deborah Mosby was convicted by a Hinds County Circuit Court jury of capital murder and received a life sentence. On appeal, Mosby alleges the following as error: introduction of evidence of her character for truthfulness when she did not take the stand; the victim's former attorney was allowed to testify as to the victim's fear of her; refusal of a challenge to a juror for cause; and insufficiency of the evidence. Though we find one error, we also find it harmless. We affirm.
 FACTS ¶ 2. The following is the evidence that is consistent with the verdict. The defendant Deborah Mosby despised her husband's former wife, Gail Mosby, who is the victim in this murder prosecution. She particularly resented the fact that her husband Richard Mosby had to pay his former wife monthly child support. The State stressed the possible motive that the victim's death would allow the defendant and her husband to be awarded custody of the two children and thereby relieve them of monthly child support. They would also have access to the social security benefits which the children would receive due to their mother's death.
 ¶ 3. Mrs. Mosby asked her stepfather, Roy Kyle, if he knew someone who could "take care of Gail." Kyle put her in contact with Billy Ray Ford and an agreement was reached whereby Ford would receive $5,000 for killing Gail Mosby. Ford ultimately pled guilty to conspiring to murder Gail Mosby. At trial, however, Ford testified that he was not hired to kill Gail Mosby but only to "rough her up" and that his plea should be set aside. Ford claimed that he and Mosby's husband went to the victim's home, that the victim and Mr. Mosby struggled, and that the victim fainted. In an alleged effort to revive her, Ford and Richard Mosby removed her clothing and placed her in a bathtub which had been filled with cold water. Somewhat contrary to that explanation, the victim was later discovered with her legs placed over the sides of the tub, which had the effect of keeping her head below the water line. They also neatly folded her clothes and placed them atop the commode tank. Ford and Mosby did not wait to see if Gail Mosby was in fact revived. Instead, she drowned.
 ¶ 4. Gail Mosby's death was not initially ruled a homicide. After several months, Deborah Mosby's sister and brother-in-law, Vickie and Ricky Mordecai, feared for their lives because they had learned that Ford had been hired by Roy Kyle to kill them due to a dispute over some marijuana stolen from Kyle's farm. Believing that Ford had murdered Gail Mosby, the Mordecais contacted the FBI and told them what they knew of the Gail Mosby murder.
 ¶ 5. Deborah Mosby, Richard Mosby, and Billy Ray Ford were indicted for the murder of Gail Mosby. Richard Mosby and Billy Ray Ford pled guilty to conspiracy to murder. Deborah Mosby was convicted after a trial. The jury was unable to reach a decision on Mosby's sentence *Page 1093 
and the trial judge sentenced her to a life term.
 DISCUSSION I. Character evidence ¶ 6. Mosby cites three improper methods by which evidence of her character was introduced: (1) leading questions; (2) references to her innocent appearance; and (3) questions regarding her truthfulness. We deal with each in turn.
 A. Leading questions ¶ 7. The leading questions asked by the State did not elicit character evidence and were not an assault on Mosby's veracity. However, leading questions can cause reversible error and we will address this assignment of error here because that is where Mosby chooses to raise it in her brief. She asserts that the State continually asked leading questions during examination of the witnesses.
 ¶ 8. Mosby only points to two specific questions asked by the State. First, the State questioned investigating Officer Charlie Smith about an apparent abrasion on the victim's nose. The point apparently being made was that force was used on the victim and the marks were not caused innocently. Smith was asked "[t]hat mark — that wasn't like pink highlight, or anything. It appeared to be some damage to the skin?" The defense objected and the prosecutor was instructed not to lead the witness. The next question asked of Officer Smith was "[c]an you distinguish between what you saw, between something with respect to — was it paint. . . . Can you distinguish what you saw between an injury to the body and paint? Can you tell whether it was either of those two things?" The defense objection was overruled and the trial court allowed Smith to answer to this phrasing. Smith answered, "[i]t looked like an abrasion, an injury to the skin."
 ¶ 9. A leading question is one that suggests to the witness the specific answer desired by the examining attorney. Whitlock v.State, 419 So.2d 200, 203 (Miss. 1982). Trial courts are given great discretion in permitting the use of such questions. Unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision. This is because the harm caused is usually speculative and likely inconsiderable and only the trial court was able to observe the demeanor of the witness to determine the harm. Id.
 ¶ 10. We agree that the first question asked of Officer Smith was leading, but the suggestion that the mark on the skin appeared to be an abrasion was entirely consistent with the answers the officer was giving to non-leading questions. Therefore we see no harm. The second inquiry was quite similar, as Officer Smith was asked whether the mark was an injury or paint. Instead of analyzing whether that was even leading, as the question poised two rather different answers, it is enough to say that the harm was the same and as inconsequential as that from the first question.
 ¶ 11. The second group of allegedly leading questions occurred after the defense examined Officer Smith regarding the initial investigation, the one that occurred immediately after the victim's death and before the information was received months later about a contract for the victim's murder. Smith acknowledged that it was normal procedure to dust for fingerprints in homicide cases. In explaining why he had failed to do so here, Smith stated that too many people had used the door after the discovery of the victim, including police and medical personnel. The door was the usual place to start with prints. Smith believed that since nothing had obviously been disturbed in the house, and since the door was not a usable site from which to take prints, that "there would have been nowhere really to start or to finish on a latent print examination." *Page 1094 
 ¶ 12. On redirect the State asked "[c]an you tell us what, if anything, you would expect to find had the home been dusted for prints if, in fact, those who came into the house who perpetrated this murder cleaned every spot up they touched?" The defense objected that the question was speculative, but the court allowed the witness to answer. We find that it was speculative but not leading. Though the testimony was speculative at that point, the State later elicited testimony from the man that the defendant allegedly hired to kill the victim, to the effect that he had wiped off the fingerprints. Such testimony would have been a proper predicate for introduction of Smith's statement. Thus the link was eventually properly made and no error occurred.
 ¶ 13. After the objection was overruled, the State rephrased the question: "[c]an you tell us whether or not what you observed with the exception of the body, whether or not that scene was consistent with somebody coming in there and perpetrating what has now been ruled a homicide and cleaning it all up? Was that consistent or inconsistent with what you found?" The defense objection was overruled and Smith responded affirmatively. That was proper for the same reason as already stated.
 B. Remarks during voir dire ¶ 14. Mosby contends that the State improperly commented upon her appearance during voir dire of the jury. The prosecutor remarked:
 Now, first of all, I have to ask a very obvious question, and that simply deals with the fact that this defendant doesn't look like Charles Manson. This defendant doesn't look like Squeaky Frohm. She looks like your average American housewife. Is there anyone here who doesn't expect someone on trial for capital murder to come to trial looking as innocent as they possibly could?
Mosby considers these remarks to be a "blatant attack on the presumption of innocence."
 ¶ 15. It is appropriate in limited circumstances for the State or the defense to ask if jurors would be influenced by improper considerations including the defendant's appearance. Looks can be deceiving. It is important to know or at least raise the juror's consciousness on whether they can ignore the irrelevancy of the defendant's appearance and focus on the evidence in the case. Though the word "innocent" was used in the question, we do not find this to transform the question into a request that the jury not consider the accused to be innocent until proven guilty. It was an inquiry into whether the jurors would follow the evidence and not appearances.
¶ 16. Analogously, the supreme court has held
 that prosecuting attorneys should refrain from commenting upon the appearance or the demeanor of the defendant at trial. Reed v. State, 197 So.2d 811 (Miss. 1967). However, we cannot say that the comments in this case prejudiced the defendant. The statements did not criticize the defendant's demeanor nor attempt to vilify him in any way.
Griffin v. State, 504 So.2d 186, 188 (Miss. 1987). The case cited in Griffin as authority presented a more seriously prejudicial closing jury argument "that the defendant sat in the courtroom and showed no emotion, and the implication was clear that, for that reason, he must be guilty." Reed, 197 So.2d at 815. Reed's conviction was reversed. The Reed court also noted a more general statement of the rule in question:
 Except where his identity is in issue, or where the remark is with respect to his appearance while he was testifying, it is generally held improper to remark on the personal appearance of accused, although the circumstances and the nature and language of the comment itself may take a particular case out of the general rule, as where there is no intimation in *Page 1095 
the remark that the accused has a bad or guilty look.
Id., citing 23A C.J.S. Criminal Law § 1102 (1961) at 192. Here there was no intimation that Mosby had a guilty look. The point being made was that since Mosby had no such look, jurors nonetheless needed to examine the evidence with an open mind. There was no error.
 C. Character for truthfulness ¶ 17. Mosby complains that the State improperly attacked her veracity even though she never testified. In its response to this issue on appeal, the State has come perilously close to misleading the Court when it asserts that there is no error because the objection to the question was sustained. If one defines "question" narrowly enough, that statement is true. The whole truth is that there were three questions and three objections. The defense objections to the first two questions were overruled. Only the objection to the last question was sustained. Whether representing the State or the defense, counsel's duty is fairly to represent the law and facts. Mosby contends that all of the objections should have been sustained.
 ¶ 18. Specifically, Mosby complains about the questioning of the wife of Mosby's stepfather:
 Prosecutor: In your dealing with Deborah Mosby did you always find her to be entirely truthful?
 A. No.
 Defense counsel: Objection, Your Honor. And I will approach.
 (Bench Conference Out of the Hearing of the Jury) Defense counsel: Your Honor, I move for a mistrial in that Deborah Mosby's reputation for truthfulness or integrity or her character not being brought up in this trial.
 Prosecutor: She is on trial for murder —
 The Court. Let him finish his objection.
 Defense counsel: And I object, Your Honor, because the only time that is proper is when and if she takes the witness stand and denies it under oath.
 The Court. It will be overruled.
 (Bench Conference Concluded) Prosecutor: Can you tell us whether or not you ever had dealings with her in which she embellished or misrepresented things to make it look in the best light for herself?
 Defense counsel: Objection your honor. Same basis.
 The Court. Overruled.
 Prosecutor: Did she ever tell you things that you just knew weren't true?
 A. Yes.
 Defense counsel: Your honor, I object and I object as to the continued leading. Your Honor. [The prosecutor] has been testifying for the last twenty minutes.
 The Court. Yes —
 Prosecutor: I will withdraw it, Your Honor.
 The Court. The question is rather vague. The objection will be sustained to that particular question.
 ¶ 19. Neither below nor here does the State argue an evidentiary basis for this question other than Mosby's being on trial for murder. One possible rule is that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation. . . ." M.R.E. 608(a). "Once the accused takes the witness stand, it is discretionary with the trial court whether to admit evidence as to his reputation for veracity." Brent v. State,632 So.2d 936, 943 n. 5 (Miss. 1994). The rule obviously is inapplicable here because Mosby did not take the witness stand.
 ¶ 20. Another relevant rule provides that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except . . . (1) [e]vidence of a pertinent trait of his character offered by an *Page 1096 
accused, or by the prosecution to rebut the same." M.R.E. 404(a).
 ¶ 21. Neither rule applies here. Mosby's credibility was not at issue and the line of questioning was improper. However, when a trial court commits error in an evidentiary ruling, reversal is warranted on appeal only when a substantial right has been affected. Peterson v. State, 671 So.2d 647, 656 (Miss. 1996). To be sure, these questions about Mosby's truthfulness did not make her into a more sympathetic person. Trying to discredit an accused by attempting to prove a variety of unsavory but irrelevant aspects of her character can be reversible error under Rule 404. Here, though, three questions about truthfulness in this contract murder case were too insubstantial to be prejudicial.
 II. Confrontation clause ¶ 22. This issue focuses on the testimony of William Barnett, now a county court judge, who prior to his selection as a judge served as the victim Gail Mosby's attorney in a divorce decree modification matter. Her former husband Richard Mosby, who at the time of Gail Mosby's death was the accused's husband, sought to modify the divorce decree to obtain custody of their two children. Judge Barnett testified that Gail and Richard Mosby got along well until Deborah Mosby became the "driving force" for modification. He believed that hand-written letters that he received allegedly from Richard Mosby were physically written by Deborah and signed by Richard. We find no Confrontation Clause problem with these statements, as the witness testified that the opinions were based on his personal observations of events. The relevance of this evidence is not separately attacked.
 ¶ 23. Also alleged as error was Judge Barnett's testimony that during the course of these proceedings, he became familiar with the defendant Deborah Mosby and with Gail Mosby's attitude towards her. According to Judge Barnett, the victim Gail Mosby "violently disliked Debbie Mosby." The defense's objection to that statement was overruled. There was no objection to the remainder of what we set out under this issue: 1) she also "was afraid of her, not only for herself, but [for] her children"; 2) she was "deathly afraid" of Richard Mosby gaining custody of the children because of the presence of Deborah Mosby in the home; 3) to lessen that possibility, Gail Mosby executed a holographic will in which she expressed her desire to have her sister raise the children.
 ¶ 24. Mosby claims that the victim's dislike and fear of the accused was based on hearsay and violated her right to confront witnesses against her. The State argues that no "statement" by the victim Gail Mosby was admitted into evidence. Instead the witness each time testified as to his observations. Judge Barnett never repeated a literal quote by Gail Mosby that she was afraid of or disliked Deborah Mosby. Still, it is difficult to imagine that all this information was gained without Gail Mosby having made some statements regarding fear and dislike, even if the statements were supplemented by Judge Barnett's observations of her emotions and his interpretations of her acts.
 ¶ 25. We see little relevance to the victim Gail Mosby's state of mind. Had that been relevant, then hearsay testimony regarding it was admissible. M.R.E. 803 (3). We in particular point out that a victim's pre-existing fear of the person accused of her murder is not in most circumstances relevant. In one precedent, the victim had informed a friend several days before her death that she was afraid that if she forced her boyfriend to move out of her home, he might kill her. Sherrell v. State, 622 So.2d 1233, 1236 (Miss. 1993). The court held that this testimony was inadmissible as there was no relevance to the victim's state of mind. Id. However, the court went on to note that part of the victim's statement was relevant to rebut defense evidence. Id. at 1237. *Page 1097 
 ¶ 26. In our case, though, any error was waived since there was no objection to the testimony regarding the victim's fear of the accused. The only hearsay statement to which an objection was made and overruled was the statement that the victim "violently disliked" the accused. In addition to waiver, we also find testimony from other witnesses introduced without objection that revealed the poisonous relationship between the two women. Especially relevant to this was testimony that the victim had been in a physical altercation with the defendant, resulting in the accused suffering a broken collar bone. There was also testimony that the accused hated the victim, and no objection was made. Thus much of what Judge Barnett stated regarding how the victim felt about the accused was rather unexceptional when viewing the other evidence. We find no fundamental right of the accused to have been injured such as to require us to apply plain error rules to this hearsay testimony.
 III. Challenge of juror for cause ¶ 27. During voir dire, juror Larry Ladner indicated that he strongly believed in capital punishment and would be inclined to vote for the death penalty in a murder case. He did admit that if the court instructed him that the death penalty is not automatic, he would follow the instructions of the court, although it would be difficult. The defense was not allowed to challenge Mr. Ladner for cause. Mosby used a peremptory challenge to strike Ladner from the jury panel. As a result, Mosby contends that she was denied her constitutional right to a fair and impartial jury.
 ¶ 28. The supreme court has explained that a prerequisite to presentation of a claim of a denial of constitutional rights due to denial of a challenge for cause is a showing that the defendant had exhausted all of his peremptory challenges and that the incompetent juror was forced by the trial court's erroneous ruling to sit on the jury. McGowan v. State, 706 So.2d 231, 241-42
(Miss. 1997). Our interpretation of the record is that Mosby did exhaust all of her peremptory challenges. However, there is no discussion of what juror deliberated on the case who was incompetent and could have been struck had not one of the peremptory challenges been used on Ladner.
 ¶ 29. We find no basis upon which to urge reversal on these facts.
 IV. Sufficiency of the evidence ¶ 30. Finally, Mosby challenges the trial court's denial of her motions for a directed verdict and for a judgment notwithstanding the verdict. She claims that the State failed to prove that a murder was committed and that she paid anyone to commit it.
 ¶ 31. Among the alleged weaknesses in the evidence is that Billy Ray Ford testified at trial that the accused hired him only to "rough up" Gail Mosby, not to murder her. Although that was Ford's testimony, there was substantial other evidence independently proving parts of the plan and discrediting Ford's statements.
 ¶ 32. Ford had pled guilty to conspiracy to commit murder in Gail Mosby's death and was sentenced to forty years in prison. When he testified at Mosby's trial, he indicated that he considered his plea agreement unfair and wished to have it set aside. When Ford entered his guilty plea, he admitted that Mosby had hired him to beat up Gail Mosby. He further admitted to facts stated by the prosecution, including the fact that he was contacted by Deborah Mosby for the purpose of "taking care of" Gail Mosby. Ford was to be paid $5,000 for his efforts.
 ¶ 33. During an earlier interview between the prosecutor and Ford that was described for the jury, Ford said that Mosby's death was a suicide because he felt she just did not want to wake up when he and Richard Mosby placed her unconscious in the bathtub. Another version was that *Page 1098 
he went to Gail Mosby's home simply to talk to her and not to rough her up. At trial, Ford testified to yet another version, that what happened to Gail Mosby was an accident: he and Richard Mosby thought that Gail Mosby would be revived by the cold bath in which they placed her. Finally, Ford further stated he was never paid for his services.
 ¶ 34. Other evidence came from Roy Kyle, Mosby's stepfather, who testified that in April of 1992, the accused asked him if he knew anyone "who could take care of Gail." Kyle then put Mosby in contact with Billy Ray Ford. Phone records substantiate the claim that there was contact between the Mosby and Ford households. Sometime after Gail Mosby's death was discovered, the accused told Kyle that Ford and Richard Mosby had in fact been responsible for the crime. The defendant later told Kyle that she had to come up with some money with which to pay Ford.
 ¶ 35. Eloise Kyle, Roy Kyle's wife, stated that after the murder, Ford informed her that he had done what the defendant had wanted done. Another witness testified that the defendant informed him that "she was involved in a murder."
 ¶ 36. The following inferences reasonably flow from the evidence: Deborah Mosby sought someone to kill Gail Mosby; Ford was hired for that purpose; Ford's testimony and pre-trial statements were not credible because he was trying to undo his plea of guilt to the murder; after the murder Ford told someone else that killing the victim was what he had been paid to do; the defendant admitted that she was involved in a murder. The defendant's bank records were introduced into evidence and evidenced large withdrawals in April and May.
 ¶ 37. In addition, Dr. Michael Baden, a forensic pathologist, testified that contrary to Ford's account, Gail Mosby did not faint before being placed in the bathtub. If she had fainted, she would have regained consciousness fairly quickly. However, Gail Mosby likely suffered from cyanosis, or oxygen deprivation, which would be consistent with the fact that she turned blue before losing consciousness. An unconscious person who had been placed in a bathtub of cold water would continue breathing and ultimately drown. Dr. Baden further testified that the abrasion on Gail Mosby's nose was consistent with someone forcibly covering her mouth and nose.
 ¶ 38. That those involved in a murder for hire would be reluctant to admit the facts is to be expected. The jury is obligated to take the evidence and within the guidance of the instructions given (none of which are contested on appeal), determine whether the State has met the burden of proof. Our standard for reviewing the sufficiency of the evidence to support the jury's verdict is to consider all the evidence in the light most favorable to the State, giving it the benefit of all favorable inferences that may be reasonably drawn from the evidence. Only if the facts so considered point so overwhelmingly in favor of the defendant that reasonable jurors could not have found guilt, are we to reverse.Coleman v. State, 697 So.2d 777, 787 (Miss. 1997). On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached this conclusion, affirmance is required.
 ¶ 39. To determine whether the evidence met this standard, we must also understand what had to be proven. The crime for which Deborah Mosby was convicted was the killing of Gail Mosby after offering (not necessarily following through by paying) "anything of value for committing the murder"; all parties to such a murder, are guilty as principals." Miss. Code Ann. § 97-3-19(2)(d).
 ¶ 40. The direct evidence and the reasonable inferences that could be drawn support the verdict. *Page 1099 
 ¶ 41. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT ON CHANGE OFVENUE TO THE HANCOCK COUNTY CIRCUIT COURT OF CONVICTION OF CAPITALMURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THEMISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OFTHIS APPEAL ARE ASSESSED TO HINDS COUNTY.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, IRVING, LEE,PAYNE, AND THOMAS, JJ., CONCUR.