979 So.2d 721 (2008)
Lacory HARRIS a/k/a Lecorry Harris Laccory Fredreko a/k/a Cory Harris a/k/a Lil C, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-01695-COA.
Court of Appeals of Mississippi.
April 1, 2008.
*723 James Kevin Rundlett, Jackson, attorney for appellant.
Jeffrey A. Klingfuss, Jackson, attorney for appellee.
Before LEE, P.J., CHANDLER and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Lacory Harris was convicted in the Hinds County Circuit Court of two counts of aggravated assault for using an automobile to cause injury to his former girlfriend and her young daughter. He was sentenced to twenty years in the custody of the Mississippi Department of Corrections (MDOC) on each count with the sentences to run concurrently with one another and consecutively to a Madison County sentence. Aggrieved, Harris appeals on the following grounds: (1) the trial court erred in allowing the prosecution to display the child to the jury; (2) the trial court erred in admitting highly prejudicial and unreliable hearsay statements into evidence as an "excited utterance"; (3) the trial court erred in refusing to grant Harris's motion for a new trial; and (4) trial counsel rendered ineffective assistance. Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY
¶ 2. Shantanner Montgomery testified that the romantic relationship between her and Harris had been over for approximately *724 five months when, on September 16, 2001, Harris deliberately caused an automobile wreck, which resulted in serious injuries to both Montgomery and her fifteen-month-old daughter, Kennedy.
¶ 3. On the Friday before the wreck, Montgomery received a telephone call from Harris at her work place in which Harris told her that he was going to get her "one way or the other." She testified that she perceived the call as a threat. On the following Sunday morning at 6:30 a.m., Harris appeared without invitation at Montgomery's house on West Capitol Street in Jackson, Mississippi, where she lived with her brother. Montgomery testified that Harris was calm and said that he wanted to talk to her. Before letting Harris in, Montgomery informed her brother that Harris was there and that she was going to talk with him. Montgomery's brother confirmed this in his testimony. Montgomery stated that she and Harris talked for about twenty minutes and that she told him she had moved on with her life. After the discussion, Harris asked her to take him to his mother's house. Montgomery said she agreed to do so because Harris had appeared calm during their talk. She placed her daughter in the back seat of her SUV, and Harris sat in the front seat. Montgomery testified that about fifteen minutes into the drive, as the vehicle was on the Interstate 220, Harris had been singing the "patty cake song" along with her daughter when, without warning, he turned to Montgomery and said, "Well, you know I'm going to have to kill you. You know I'm going to have to hurt you in the worse way possible." He then grabbed the steering wheel and jerked it, causing the SUV to move into the right-hand lane, then flip and roll over four or five times. Montgomery and her child were thrown from the vehicle and severely injured. Harris fled the scene.
¶ 4. At trial, three "Good Samaritans" and the Jackson police officers who investigated the wreck confirmed much of Montgomery's recollection of the events. Sherry Green, who was driving directly behind Montgomery's vehicle, stated that as the SUV flipped, people and things went flying out of the vehicle. Green confirmed Montgomery's testimony as to Harris's flight from the scene. She testified that she saw a young man running from the wreck and asked him if he needed help, but he just kept running. Montgomery stated that when she found her fifteen-month-old daughter, one of the child's legs was completely severed and the foot on her other leg was dangling. Green, who was a licensed practical nurse, stated that she took a scarf from a bystander and tied it around the toddler's leg to stop the bleeding and covered the child. According to Green, Montgomery was so hysterical that she shook her and told her that she had to be quiet so that the child would become quiet. Green said that she told Montgomery to lie beside the baby to keep the child from going into shock. Green testified that Montgomery told her that Harris had snatched the wheel from her and caused the accident.
¶ 5. Patricia Hayes, a registered nurse who also stopped at the scene, testified that when she arrived other people were already there, and the injured mother and child were on the ground. She could see that the child's leg had been cut off. Hayes stated that Montgomery was very upset and crying. Hayes testified that Montgomery said that the man who was riding with her had grabbed the steering wheel and caused the SUV to swerve off the road, causing the wreck. Hayes testified that she checked the scarf that had been applied to the child's leg, tightened it, and made sure that pressure was applied "so that the baby didn't bleed to death." A local minister, Rev. Jeffrey Stallworth, *725 also stopped to render assistance shortly after the wreck occurred. According to Rev. Stallworth, when he arrived on the scene he saw the mother lying on the ground with the child; the mother was very upset and was saying "things like he did this to me." Rev. Stallworth also recounted that Montgomery told him that the man who was riding with her told her that he had to hurt her and then pulled the steering wheel from her, causing the wreck. Jackson Police Officer Jackie Watson arrived at the scene and took a statement from Montgomery, who told her that Harris had grabbed the steering wheel, causing the SUV to wreck. Detective Azell Smith testified that Montgomery told her that Harris suddenly grabbed the steering wheel; the SUV flipped; she and the child were thrown out; and Harris left the scene, running. Detective Smith was unable to locate Harris to take his statement.
¶ 6. As a result of the wreck, both of Montgomery's arms were broken in eight-to-ten places, and she had to be placed in a full body cast. The toddler, Kennedy, had her left leg amputated, but the physicians were able to reattach the foot on her other leg.
¶ 7. Harris's testimony of the events, not surprisingly, differed significantly. He stated that he spent the night before the wreck with Montgomery and that on the morning of the wreck, Montgomery was acting unusual. Harris related an earlier event in which Montgomery chased him and the mother of his child at a high rate of speed after he and Montgomery had broken up. Harris stated that on the day of the wreck he asked Montgomery to take him to his brother's house, but instead, Montgomery got on the interstate. According to Harris, he kept telling her to strap Kennedy into her baby seat "cause I don't want no confrontation with the police behind us seeing the thing up on the baby seat and pulling us over about the baby not being strapped down. . . . [b]ecause at the time I had two warrants out for my arrest and I wasn't trying to get in no confrontation with the law." He testified that she became angry and told him not to tell her how to treat her own child. Harris stated that he asked to use her cell phone, and he called his "fiancée at the time," Antoinette. He claimed that when Montgomery heard him talking to Antoinette, she grabbed for her cell phone and lost control of the SUV, causing the wreck. Harris denied jerking the steering wheel. He said that after the wreck he ran for help to a nearby gas station, but he did not actually call anyone for help; instead he told the people at the station about the wreck. He then thought about the situation, "I'm here on the run and they got warrants out for my arrest[,] so I left and didn't come back to the scene." Harris was arrested later that week for a Madison County cocaine possession charge and did not learn of the aggravated assault charges until 2003.
¶ 8. After less than an hour of deliberations, the jury returned guilty verdicts on both counts of aggravated assault. Harris was sentenced to twenty years in the custody of the MDOC as a habitual offender on each count with the sentences to run concurrently with one another and consecutively to his sentence in Madison County. The trial court denied post-trial motions, and this appeal ensued.

DISCUSSION
I. Whether the trial court erred by allowing the prosecution to display the injured child to the jury.
¶ 9. During its case-in-chief, the State asked Montgomery what injuries she and her child suffered as a result of the wreck. Montgomery testified that she was *726 in a full body cast and had both arms broken in eight-to-ten places. The State asked, and the trial court agreed to allow Montgomery to bring the child before the jury as she testified about the injuries the child suffered as a result of the wreck. Harris objected, but he stated no reason for the objection.[1]
¶ 10. Harris argues that allowing the child to appear before the jury was more prejudicial than probative and should have been precluded under Rule 403 of the Mississippi Rules of Evidence. He argues that "displaying" a severely injured small child before the jury is highly emotional and led the jury to base its verdict on sympathy rather than on the facts. Harris contends that the child's injuries were not disputed and could have been established by stipulation, medical records, or testimony.[2] He asks this Court to engage in a Rule 403 balancing process, weighing whether the probative value of the jury's viewing the injured child was outweighed by its potential prejudice to Harris.
¶ 11. After conducting the Rule 403 balancing inquiry, we find no abuse of discretion on the part of the trial judge in allowing the child to be displayed to the jury. First, the Mississippi Constitution guarantees the victim of a crime the right to be present and be heard during the criminal proceedings. Miss. Const. art. 3, § 26A. Likewise, Mississippi Code Annotated section 99-43-21 (Rev.2007) provides that: "[t]he victim has the right to be present throughout all criminal proceedings[.]" Second, Mississippi Code Annotated section 97-3-7(2) (2000), which sets forth the elements of aggravated assault, states as follows in pertinent part:
A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm. . . .
Dunn v. State, 891 So.2d 822, 825 (¶ 20) (Miss.2005) (quoting Miss.Code Ann. § 97-3-7(2) (2000)). Therefore, because the State was required to offer proof of serious bodily injury in order to convict Harris of aggravated assault, we cannot say that the jury's viewing the child's actual injuries was devoid of probative value. Finally, under these circumstances, we do not find that the trial court abused its discretion in finding that the probative value of the jury's viewing the child's injuries was not substantially outweighed by unfair prejudice to Harris. Therefore, this issue is without merit.
*727 II. Whether the trial court erred in admitting highly prejudicial and unreliable hearsay statements into evidence as an "excited utterance."
¶ 12. Harris argues that the only witness who gave testimony that he committed a crime was Montgomery, and the rest of the State's witnesses were erroneously allowed, over objection, to give hearsay evidence of his guilt.
¶ 13. The testimonies to which Harris objects are primarily those of the persons who responded to the accident scene shortly after the wreck. They were: Green, the nurse who saw the accident, bound the wounds of the injured child, and described Montgomery as so hysterical she had to be shaken; Hayes, another nurse who found Montgomery "very upset and crying" on the ground, cuddling her injured daughter; Rev. Stallworth, who arrived on the scene shortly after the wreck and found Montgomery "very upset" and talking repeatedly about her baby; and Watson, the Jackson police officer who investigated the scene of the wreck before the injured parties were taken to the hospital.
¶ 14. Harris contends that the excited utterance exception to the hearsay rule should not apply because when Montgomery made the statements to the bystanders, she was no longer under the stress of the accident; instead, she had time to invent a story to blame Harris for the accident she caused.
¶ 15. The standard of review for admissibility of evidence is abuse of discretion. Ellis v. State, 934 So.2d 1000, 1004 (¶ 17) (Miss.2006). This Court will not order a reversal based on a ruling that allowed or excluded evidence unless a substantial right of the defendant was affected by the ruling M.R.E. 103(a).
¶ 16. Rule 801(c) of the Mississippi Rules of Evidence defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). Clearly, the testimonies of those witnesses who came to Montgomery's aid and of the investigating police officers regarding Harris causing the wreck were hearsay testimony. None had independent knowledge of Harris's actions of jerking the steering wheel. However, Rule 803(2) of the Mississippi Rules of Evidence provides an exception to the exclusion of hearsay based upon "excited utterance[s]." The exception applies to statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). "The reliability of an excited utterance is based on the premise that circumstances may place the declarant in such an excited state as to temporarily impede the capacity for reflection." Smith v. State, 733 So.2d 793, 798-99 (¶ 20) (Miss.1999). In evaluating whether a statement qualifies as an excited utterance, "[i]t is important that there has been no intervening matter to eliminate the state of excitement and call into question the reliability of the utterance." McCoy v. State, 878 So.2d 167, 173 (¶ 12) (Miss.Ct.App.2004) (citing Berry v. State, 611 So.2d 924, 926 (Miss.1992)). Spontaneity is essential for a statement to be admitted into evidence as an excited utterance. M.R.E. 803(2) cmt.
¶ 17. Applying these rules to the testimony given by the challenged declarants, we find that all of their hearsay statements fall under the excited utterance exception. Green saw the accident occur and was the first one on the scene. She found a hysterical Montgomery looking for her child, who had been thrown from the SUV. Green testified that Montgomery was so upset that she had to shake her in order to *728 calm her so she could care for the injured child. Hayes and Rev. Stallworth arrived a little later, but Montgomery, according to their testimony, was still very upset and crying as she held her child. Officer Watson, who investigated the wreck, testified that Montgomery was upset when she took her statement incriminating Harris. Seriously injured by the wreck and suffering from multiple breaks and fractures, Montgomery gave statements to the three "Good Samaritans" and Officer Watson that Harris caused the wreck by intentionally grabbing the steering wheel. Her statements were made shortly after the trauma of the wreck in which she sustained injuries and after searching for and finding her small daughter seriously injured. Based on these facts, we find that the statements Montgomery made were excited utterances. Montgomery had no time for conscious reflection as Harris claims. Accordingly, this error is without merit.
¶ 18. Harris also claims error regarding the testimony of Tonya Chambers, another police officer who testified about photographs she took at the scene. Chambers's testimony did not incriminate Harris and only described the photographs she took of the wrecked SUV. Further, and most importantly, Harris made no contemporaneous objection to Chambers's testimony on any grounds. "It is axiomatic that a litigant is required to make a timely objection." Washington v. State, 957 So.2d 426, 429 (¶ 13) (Miss.Ct.App.2007) (quoting Smith v. State, 797 So.2d 854, 856 (¶ 7) (Miss.2001)). The failure to make a contemporaneous objection procedurally bars any allegation of error. Id. Accordingly, this issue is without merit.
III. Whether the trial court erred by refusing to grant Harris's motion for a new trial.
¶ 19. Harris claims that his conviction was against the overwhelming weight of the evidence and that he is therefore entitled to a new trial. He argues that the jury was so inflamed by bias and prejudice that they were ready to convict him from the beginning of the trial.
¶ 20. "A motion for new trial challenges the weight of the evidence." Dilworth v. State, 909 So.2d 731, 737 (¶ 20) (Miss.2005). We will only reverse a decision to deny a new trial if the trial court abused its discretion in denying the new trial motion. Id. In considering the motion, the Court weighs the evidence in the light most favorable to the verdict. Id. at (¶ 21). It is only in "exceptional cases in which the evidence preponderates heavily against the verdict" that the trial court should invade the province of the jury and grant a new trial. Id. (quoting Amiker v. Drugs for Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss. 2000)).
¶ 21. Despite Harris's protestations to the contrary, we find that the trial court did not err in failing to grant him a new trial. Harris claims that after the vehicle wreck, Montgomery fabricated a story to blame him for the wreck. He contends that, in order to convict him, all the jury had to hear were three "inconsequential bits of information": (1) there was a severely injured infant; (2) Harris was a womanizing ex-convict; and (3) he left the scene of the accident. According to Harris, Montgomery had a "manifest interest in avoiding blame for the accident" due to her failure to restrain her child properly, and therefore, her testimony was not credible. Harris also contends that Montgomery's testimony is "inherently unlikely" and unreliable because it was not supported by any physical evidence or corroborating witnesses.
¶ 22. However, Harris's argument misses the salient point: the jury found that he *729 deliberately caused the wreck that maimed the child and seriously injured her mother. The jury made a credibility decision between Harris's version of events and Montgomery's version and accepted Montgomery's. The jury, as the finder of fact, was completely within its authority in making the finding. It is well settled that the testimony of a single uncorroborated witness is sufficient to sustain a conviction even though there may be more than one person testifying to the contrary. Williams v. State, 512 So.2d 666, 670 (Miss.1987). Here, however, there was more than just Montgomery's testimony as to Harris's guilt. The three "Good Samaritans" testified that a hysterical Montgomery told them that Harris deliberately jerked the steering wheel to cause the wreck. Also, the police officer, who investigated the wreck and who encountered a badly injured mother holding her recently dismembered child, testified that Montgomery told her Harris had deliberately caused the wreck. The jury accepted Montgomery's testimony that Harris kept his vow "to hurt [her] in the worse way possible" and did so when he caused the wreck that injured her and handicapped her child forever. Accordingly, we find no error in the trial court's failure to grant Harris a new trial. This issue is without merit.
IV. Whether Harris's trial counsel rendered ineffective assistance of counsel.
¶ 23. Harris contends that his trial counsel was ineffective; he raises this issue for the first time on direct appeal. "While this Court may consider the merits of a claim of ineffective assistance of counsel raised for the first time on direct appeal, it is unusual to do so because `[w]e are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim.'" Wynn v. State, 964 So.2d 1196, 1200 (¶ 9) (Miss.Ct.App.2007) (quoting Wilcher v. State, 863 So.2d 776, 825 (¶ 171) (Miss.2003)). "Our supreme court instructs that, on direct appeal, the entire record should be reviewed." Id. (citing Read v. State, 430 So.2d 832, 841 (Miss.1983)). "This Court will reach the merits of an ineffective assistance claim only in instances where, `(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" Id. (quoting Wilcher, 863 So.2d at 825 (¶ 171)). "Where the record is insufficient to support a claim of ineffective assistance, `[t]he appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief.'" Id. (quoting Aguilar v. State, 847 So.2d 871, 878 (¶ 17) (Miss.Ct.App.2002)).
¶ 24. In the instant case, the parties have made no stipulation as to the adequacy of the record; therefore, we must inquire whether the record affirmatively shows that Harris was denied effective assistance of counsel. In making this inquiry, we must determine whether Harris's representation was "so lacking in competence that it becomes apparent or should be apparent that it is the duty of the trial judge to correct it so as to prevent a mockery of justice." Id. at (¶ 10) (quoting Ransom v. State, 919 So.2d 887, 889 (¶ 9) (Miss.2005)).
¶ 25. The requirements of proving ineffectiveness of counsel are as follows:
To prove a claim of ineffective assistance, a defendant must show (1) that his defense counsel's performance was deficient, and (2) that the deficient performance was prejudicial to his defense. Strickland v. Washington, 466 U.S. *730 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Swington v. State, 742 So.2d 1106, 1114 (¶ 22) (Miss.1999). "The determination of whether counsel's performance was both deficient and prejudicial must be determined from the `totality of the circumstances.'" Cole v. State, 666 So.2d 767, 775 (Miss.1995) (citation omitted). The defendant bears the burden of proving both prongs of Strickland and faces a rebuttable presumption "that trial counsel's conduct is within the wide range of reasonable conduct and that decisions made by counsel are strategic." Edwards v. State, 615 So.2d 590, 596 (Miss.1993) (citing Leatherwood v. State, 473 So.2d 964, 969 (Miss.1985)). To rebut this presumption the defendant must show that, ["]but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Wynn, 964 So.2d at 1200 (¶ 11). Harris claims that his trial counsel was ineffective for two reasons:
A. Trial counsel failed to procure exonerating telephone records.
¶ 26. Harris's appellate counsel, who is different from his trial counsel, claims that trial counsel's failure to subpoena certain telephone records amounted to ineffective assistance of counsel. The telephone records at issue are those of Montgomery's cell phone from the day of the accident. Harris's version of the wreck was that he asked Montgomery to use her cell phone while they were traveling in the SUV. Harris testified that he called another girlfriend, and once Montgomery realized this, she tried to snatch the cell phone away from him, causing her to lose control of the vehicle and wreck. Harris contends that the cell phone records would have exonerated him.
¶ 27. With regard to this claim, we cannot say that the record before us is sufficient, without more, to establish ineffective assistance of counsel. The cell phone record, which Harris claims would bolster his version of events, is not a part of the record on appeal. Therefore, Harris's claim of ineffective assistance of counsel will not be addressed, and it is dismissed without prejudice to preserve his right to renew such a claim on post-conviction collateral relief if he so chooses.
B. Trial counsel failed to object to continuous, prejudicial leading questions during the direct examination of the alleged victim or, in the alternative, the trial court committed plain error by allowing the same.
¶ 28. Harris claims that his trial counsel was ineffective for failing to object to fifty leading questions asked of Montgomery by the assistant district attorney during her testimony. Harris separately sets out each of the fifty questions that he contends are improper leading questions.
¶ 29. A leading question is one which suggests the desired answer or puts words into the witness's mouth to be echoed back. McDavid v. State, 594 So.2d 12, 17 (Miss.1992). Rule 611(c) of the Mississippi Rules of Evidence states that leading questions should not be used on the direct examination of a witness except "as may be necessary to develop his testimony." M.R.E. 611(c). The comment to the rule explains, "Leading questions as a general rule should not be used on direct examination since they suggest the answers the attorney wants from his own witness. This gives an unfair advantage to the party who is presenting his case." M.R.E. 611 cmt. "[T]he decision to allow leading questions rests within the sound discretion of the trial court." Parks v. *731 State, 930 So.2d 383, 387 (¶ 9) (Miss.2006) (citing McFarland v. State, 707 So.2d 166, 175 (Miss.1998)). "Unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision. This is because the harm caused is usually speculative and likely inconsiderable and only the trial court was able to observe the demeanor of the witness to determine the harm." Mosby v. State, 749 So.2d 1090, 1093 (¶ 9) (Miss.Ct.App.1999) (citing Whitlock v. State, 419 So.2d 200, 203 (Miss.1982)).
¶ 30. Based on the record before us, we find that Harris has failed to demonstrate that trial counsel's failure to object to the alleged leading questions constituted ineffective assistance. This Court has recognized that failure to object to leading questions may fall within the ambit of trial strategy. See Bullard v. State, 923 So.2d 1043, 1047 (¶ 13) (Miss.Ct.App.2005) ("This Court also is mindful that not objecting to leading questions by the State could have been a trial strategy."). In Bullard, we held that the defendant had failed to demonstrate prejudice resulting from his counsel's failure to object to leading questions asked by the State because "[t]he same answers could have been elicited by simply rephrasing the question." Id. (citing Jackson v. State, 614 So.2d 965, 971 (Miss.1993)). We reach the same conclusion in this case. "[T]rial counsel's failure to object to leading questions, without proof that prejudice resulted, does not amount to ineffective assistance of counsel." Id. (citing Al-Fatah v. State, 856 So.2d 494, 503 (¶ 24) (Miss.Ct.App.2003)). Moreover, with regard to Harris's argument that the trial court committed plain error in allowing the alleged leading questions, we cannot say that under the context and circumstances of this case that the trial court abused its discretion in allowing the prosecutor to ask the questions challenged on appeal. Accordingly, this issue is without merit.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF TWO COUNTS OF AGGRAVATED ASSAULT AS A HABITUAL OFFENDER AND SENTENCE OF TWENTY YEARS ON COUNT I AND TWENTY YEARS ON COUNT II WITH THE SENTENCE IN COUNT I TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT II AND CONSECUTIVELY TO THE SENTENCE IN MADISON COUNTY CAUSE NUMBER XXXX-XXXX IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Harris had previously filed a motion in limine seeking to prevent the child from being present during the trial, and Harris's attorney offered to stipulate that the child was forced to have her leg amputated as a result of the accident, but the State refused. The trial court denied the motion.
[2] Harris notes that the Mississippi Supreme Court has held that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied and the corpus delicti and the identity of the deceased have been established." Sharp v. State, 446 So.2d 1008, 1009 (Miss. 1984) (citing Shearer v. State, 423 So.2d 824, 827 (Miss. 1982)). The supreme court has also stated that "gruesome photographs which have no evidentiary purpose and which only arouse the emotions of a jury should not be admitted, but the mere fact that a photograph may arouse the emotions of jurors does not render it incompetent so long as the photograph serves a legitimate evidentiary purpose." Id. (citing May v. State, 199 So.2d 635, 640 (Miss. 1967); Shearer, 423 So.2d at 827).